This is the case of People v. Jeremy Ramey, 524-0605. Sorry. You may proceed. Good afternoon, Your Honors. Counsel, may it please the Court. My name is Sofa Belusu, representing Jeremy Ramey, the appellant in this matter. Your Honors, Ramey raises three issues on a kill, but I'd like to focus on the first two. First, that the evidence is legally insufficient to sustain a constructive possession conviction. And second, that trial counsel was ineffective for stipulating to DNA evidence that was both confusing and highly prejudicial. If the Court has any questions regarding Ramey's third issue, regarding Berwyn, I would be happy to address those as well. So you're not going to argue the Second Amendment issue? Unless Your Honors have any questions. Okay. I do. Okay. Are you aware of the case of People v. Stevens in this Court? In this Court? No, Your Honor. Justice McCaney and another panel of this Court has determined that the Second Amendment applies to felons. What is your position on that? Berwyn states that there is a distinction between non-violent and violent felons, after which then there is a determination of a historical analog. Here, Ramey was a non-violent felon. It was a traffic conviction. And there is no historical precedent for a permanent disarmament. Isn't one of the issues whether or not the Second Amendment applies to felons at all? Whether all the people is included, whether the word felon is included in all the people? Your Honor, there is some debate about whether or not violent felons and felons in general are considered law-abiding citizens. Law-abiding citizens. But Rahimi does have some language that would support there is a difference between felons and non-violent felons. Okay. You proceed the way you want to proceed. Your Honor, first, even the light most favorable to the State, this case begins with a firefight involving two cars. We must then acknowledge that we have video evidence, although not a full accounting of the night, it is a non-partial, unbiased accounting of what happened. We see in that video that he fell near a single chunked tree and that the gun was later recovered at a three-limbed tree, distinctive because one of those limbs had been cut. The State offers no explanation for this inconsistency. There was no footage of Ramey placing anything on the ground. The firearm was not recovered from Ramey's person. There were no fingerprints on the gun, shell, or casings. No covered bullets, shells, and bullet fragments were not conclusively linked to that recovered gun. Witness Schroeder's testimony was discredited and inconsistent, and the jury did acquit Ramey of aggravated discharge. Your Honor, as we know that since no weapons were found on his person, Jamie Ramey did not actually possess the firearm. Further, it is appropriate to find constructive possession only where there is both exclusive control and knowledge, neither of which was here sufficiently proven. There was no confession, no conclusive forensic or video evidence, and the State only relies on weak, incomplete evidence. The State cites to Ramey's flight as evidence of guilt, but it more plausibly supports Ramey's claim that he was fleeing from gunfire. We know that Schroeder was responding to reports of shots fired, and we know that Schroeder's call to dispatch, he said that there were shots being fired between two cars. Even if Ramey was mistaken and he was not being targeted, case law confirms that there can be no rational inference of guilt from fleeing a life-threatening situation. Your Honors, the U.S. Supreme Court in Ward Law acknowledges that a person may flee not out of guilt, but from a belief, either justified or not, that police contact itself is dangerous. Similarly, the Ninth Circuit in Brown recognizes that a simple desire to avoid police interaction can itself provide an innocent explanation for flight. The State then cites to Hammer to show how exclusive control can be analyzed, but in that case, the gun was found in a bedroom, and that court explicitly said the defendant had exclusive control over it. Here, in contrast, Your client didn't testify, did he? That's correct, sir. Thank you. Here, in contrast, there is no credible argument that would suggest Ramey had exclusive control over a tree in a public area. The State then relies on Officer Schroeder's testimony, in which he claims to have seen and then hide it. But the jury clearly rejected his account, as it conflicts with forensic evidence. Again, none of the recovered shells, bullets, or fragments could be linked to that firearm. Additionally, there's a 19-minute delay between Schroeder supposedly finding the gun and reporting that gun to dispatch. Lastly, the State presents a relatively new likelihood ratio based on STR testing, or short tandem reviews. The stipulated DNA evidence indicates that the mixed sample is, and Your Honors, I'll quote here, 34,000 times more likely if it originated from Jeremy Ramey and three unknown, unrelated individuals than if it had originated from four unknown, unrelated individuals. And this conclusion is also stipulated, too, that this analysis provides strong support for the proposition that Jeremy Ramey is a contributor to the DNA profile. Here, the software compares two hypotheticals, one where the defendant is a contributor to the sample and one where he is not. This differs from the traditional method of comparing a full profile created with a more robust DNA sample, usually blood or semen, and it's then compared against another full profile. This new method relies on assumptions, uses only partial DNA fragments, and was previously considered too little data to analyze. It is not conclusive. Importantly, the software will always provide a ratio, meaning it always implies some likelihood of guilt, even when, like here, the evidence is weak. This does not confirm that Ramey's DNA was on the gun. It only suggests that it was possible. Ultimately, a likelihood ratio is speculative and less likely than traditional DNA. It misleads the jury by presenting a number that appears precise but lacks the evidentiary certainty of a full DNA match. Even if that evidence was deficient performance, you would have to meet the prejudice standard, wouldn't you? That's correct, Your Honor. How would the trial have come out differently based on that one issue? Your Honor, we do not have a direct possession of the gun. Well, you have an officer who sees the defendant running and then fall by a tree and then this gun is miraculously found by a tree. In video footage of the officer of the pursuit. You're right, Your Honor. We do have video evidence of a pursuit. We do not have video evidence of Ramey possessing a gun or shooting the gun. Further, had the jury believed Officer Schroeder's testimony of having seen Ramey shoot and fire the gun, they cannot have found Ramey innocent of aggravated discharge. What about this notion that Justice Case just asked about? What was the prejudice, even if the stipulation was in fact deficient? Because this is a closed case and the evidence is pretty tight, there's no other evidence linking Ramey to the gun. The GSR was inconclusive. The firearm was not recovered on his person. There were no fingerprints on any of the guns or casings. It's very likely that this jury believed this DNA evidence. It's very likely that since the jury rejected key state's testimony, that this possession conviction turns on this DNA stipulation. Absent this misleading DNA evidence, there is a reasonable probability that the result would have been different. Would you honors like me to go into a little bit more about the DNA itself? That's fine. Your honors, a likelihood ratio is speculative and less reliable than traditional DNA testing. It misleads the jury by presenting a number that appears precise, but lacks the evidentiary certainty of a full DNA match. Trial counsel did not cross-examine, challenge, or clarify any of the evidence that was offered. Had it been subjected to cross, the jury would have understood these inherent problems in a likelihood ratio. It would have exposed limitations, raised doubt, and reduced the impact of that evidence. If I may briefly conclude.  Your honors, we ask that you reverse Bramey's conviction because either the evidence is insufficient to convict, or that the state's statute under which he was convicted was unconstitutional. Alternatively, we ask that you reverse and remand because trial counsel was ineffective for stipulating to DNA evidence. Thank you. Thank you. Okay, thank you. You'll have an opportunity to rebut. Mr. Marshall. Thank you, your honor. May it please the court, counsel, Trent Marshall for the state. I'm arguing on behalf of a co-worker who couldn't be here today. I think he did a pretty bang-up job with his brief. I just wanted to maybe respond to some things raised in the defendant's reply. If you guys have any questions, please jump in. The defendant suggests that the dash cam undermines the officer's credibility, but it actually, when considered in conjunction with his testimony in the other, in his body cam video, actually is entirely consistent. The defendant argues that the video shows, it's true, the video shows the defendant tripping near the base of a single trunk tree. There is no footage showing him placing anything on the ground. It's true. He testified, observed, she says, or the defendant says, she wrote or testified that he observed the defendant dropping a gun by the tree. That is not true. Then he said, then the defendant continues, the body worn camera footage shows the firearm was not found at the base of the tree, but on the crotch of a three-trunk tree. This location differs from what was observed in the video. These are partially true. The video, in context, the dash video at 2047, you can hear the officer say, stop. And then the defendant stumbles, not tumbles, but just stumbles a little. And then he keeps going. He's by that first tree. And then he keeps running toward the three-trunk tree. And there's something rusty, cylindrical looking to the right of it. And then all of a sudden, the camera goes, because he's parking his car. And thereafter, it's concentrated on the Durango. So that's it. That's all for that. Then later, five to six minutes later, he estimated, when he recovers the weapon, lo and behold, it's behind the tri-trunk tree by the rusty object, which appears to be a length of, like, gardening fence. It's rolled up. So that's entirely consistent with his testimony, which the defendant tripped and fell, got back up, continued to run, went behind a tree where he placed an object, and thereafter was compliant. The defendant challenges the officer's decision to go to the Durango before securing the weapon. But he explained, we were checking it out. It had bullet holes in it. We were checking it. It's an officer safety thing. It could be an emergency assist thing. But it was night. No one else was around. They knew the gun was somewhere over here with these trees. The scene was secured. The defendant was in the back of the car by that point. So he explained that. Make a big deal about it. And then he managed to report the gun that they found. Once they found it, well, he explained, there's a lot of traffic, radio traffic going on. He couldn't chime in. It took him a while. The defendant, and this is, the defendant accuses the state of misrepresenting and distorting the gunshot residue evidence. I would just direct the court's attention to pages 337 to 41 of the record, and I'd submit that the state didn't distort or misrepresent anything. I would say, okay, jury obviously discounted Schroeder's testimony that he saw the defendant firing the gun. Found him not guilty of the discharge count. Putting aside that it's improper to challenge a conviction on the basis of inconsistent verdicts, which I concede was not cited, I think here it's understandable. And it doesn't necessarily mean that it didn't believe Schroeder at all. None of the recovered shelves, as she noted, matched the gun they recovered. They found a lot of shelves. He was wearing gloves. Could have been transferred. GSR could have been transferred that way. Could have been transferred on him handling the gun before he put on the gloves. Not sure. But counsel's closing, he emphasized that Schroeder's initial observation, and you'll see this on the video, he sees two cars zooming by. It's a Monte Carlo, I think, and a black minivan. And his initial impression was they're shooting each other. And then he says, must have been two minutes left, I saw a defendant firing a gun. And then I saw him. And I chased him. And in his initial radio thing, he didn't say, he said, I saw someone run. He didn't mention shooting or guns. He said my initial impression was guns. So maybe he saw discharges simply. But here's the real thing. Counsel brought this up later, too. There are different patrol cars behind the scene. There's apparently a guy out there with jerk locks and a black and red flannel. So I'm looking at all this. He's rolling in his car. He looks up briefly. He sees two people. One of them heads east. Maybe that was the one who actually fired the shot in the black and red flannel. He goes north and gives chase to the defendant. And you'll see that entire chase. So for him to show up and then he finds a gun, that was the guy I saw firing the gun. Like attorneys, police officers, you make mistakes. So I think the jury might have just been like, you know, jumped to a conclusion on that one. They took the state's burden very seriously. But I don't think it should be viewed as something that can go against the good count or the count that they convicted him of. As to the DNA expert, okay, you stipulate that. So we assume that the expert was going to come in and testify to everything that it was going to be stipulated to. So maybe counsel, as a strategic matter, said, I don't want to go in and get into the particulars of what strong support means. There's a little piece of paper. And in an argument, he got up there and he just, there's no match. Four different DNAs, not a match. It's just strong support. And then he was able to just kind of downplay it that way. That's what I think was done. If there are any questions, I would just ask that the defendant's conviction be affirmed. Thank you for your time. What do you have to say about the trial strategy argument? Your Honors, it cannot be trial strategy to stipulate to an element of the crime that he was convicted. Trial counsel. I'm talking about the DNA. Indeed, as am I. There was a stipulation, in the stipulation, it says that this provides a strong support for the proposition that Jeremy Ramey is a contributor to the DNA profile. We know that the jury did not believe Schroeder's testimony. A jury is duty bound to convict based off of evidence before it. Given that they did not believe Schroeder's testimony, the strongest evidence the state has against Ramey is the stipulation. Trial counsel was ineffective for stipulating to evidence that resulted in Ramey's conviction. But the expert would have come in and testified to that anyway. Your Honors, cross-examination is not necessarily about changing the expert's conclusion. It's about showing the jury what goes into having this likelihood ratio. How the likelihood ratio was created, what hypotheticals are in it, what assumptions those hypotheticals are based on. But again, couldn't that be strategy so as to not bolster the state's case? To stipulate could possibly be a strategy. No, Your Honor. It is impossible to stipulate to an element of a crime that the client was then later convicted of. Counsel stipulated to both elements that Ramey was a felon and that this DNA was more likely than not his. In unlawful possession of a weapon by a felon, it's often that the parties will stipulate to a prior felony conviction. That's correct. That is the stipulation that is an element of a crime. That is correct. You just told me you can't do that, that that can't be trial strategy. Here, trial counsel stipulated to both elements of this crime. Which elements? That Ramey was a felon and that Ramey's DNA was on the gun. Even when we stipulate that it was on the gun, there's a 34,000% more likelihood that it was. Your Honor, the conclusion was stipulated to that it provides strong support for the proposition that Jeremy Ramey is a contributor to the DNA profile. That is a stipulation to an element of a crime. So you're saying that by doing that, there was nothing left for the jury to decide. That's exactly right. So it could not have been trial strategy. That's exactly correct. I see. Thank you, Your Honors. Questions?  Questions? Okay. Did you come a long way to join us today? I did, Your Honors. From the first to the fifth. We appreciate your arguments here today. Nice to meet you. And Mr. Monk, thank you as well. This matter will be taken under advisement. We'll issue an order in due course. Have a good trip home.